UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LESLIE MAXIE,<br><br>Plaintiff,<br><br>v.<br><br>QVC GROUP INC f/k/a QURATE RETAIL INC and QVC, INC.<br><br>Defendants. | Index No. 03:25-cv-03024<br><br>AMENDED COMPLAINT<br><br>Jury Trial Demanded |

Plaintiff Leslie Maxie ("Plaintiff"), by and through their undersigned counsel, Patrick Doerr PLLC, respectfully submits this Complaint against QVC GROUP INC. f/k/a QURATE RETAIL INC. and QVC INC. (collectively referred to as "Defendants") and alleges as follows.

**PRELIMINARY STATEMENT**

1. This case is a prime example of the well-worn tale of a large corporation taking advantage of a well-intentioned Plaintiff, all in the service of making as much money as possible with as little overhead as possible

2. There is no other reason why corporations as large as the Defendants would approach a party with flowery and false promises of resources and exposure in order to lure her to an interview and extract the details of a work that is of great individual importance to that party..

3. Plaintiff is a champion of an oft overlooked group in our society, which too often inappropriately holds that youth is the exclusive link to life and beauty.

4. This unfortunate truth is often hypocritically focused on women over 50, who wrongly find many opportunities denied to them simply based on their age.

5. It is because of this societal defect that Plaintiff created Not Your Mamas 50 ("NYM 50"), in order to establish a platform where women over 50 can be the focus and advocate for the causes that are important to their demographic.

6. Defendants recognized this after hearing Plaintiff speak at the 2022 Woman in Retail Conference and could not get her in for an interview fast enough.

7. During the interview, Defendant's peppered Plaintiff with questions and comments in an effort to extricate the details behind NYM 50, all the while knowing that they did not want Plaintiff to be its face.

8. Defendants showered Plaintiff with praise at the interview, but never fully committed to her.

9. They strung her along and offered her secondary and substandard opportunities while she waited.

10. They disappeared for months on end.

11. They sent her blank contracts that they asked her revise personally.

12. All the while assuring her that she was in their plans for the future.

13. After months and months of such conduct, almost "miraculously", QVC announced Fab 50+ with Mally Roncal, a concept that was almost identical to Plaintiff's, just without Plaintiff attached to it.

14. The wrongdoing is as obvious as it is devious.

15. Defendants got what they wanted out of Plaintiff through their misrepresentations, failed to compensate her, and then strung her along until they could slap a coat of paint on NYM 50 and call it Fab 50+.

* * * *

16. Thus, based upon the above-described conduct, this is an action for Fraudulent Inducement and Unjust Enrichment.

## THE PARTIES

17. Plaintiff is an individual domiciled in the State of New Jersey residing at 15 Magnolia Court, Lawrenceville, NJ 08648.

18. Defendant QVC Group f/k/a Qurate Retail Inc. ("Qurate") is a foreign corporation incorporated in the State of Delaware with its principal place of business located in the State of Pennsylvania at 1200 Wilson Drive, West Chester, PA 19380.

19. Defendant QVC Inc.. ("QVC") is a foreign corporation with its principal place of business located in the State of Pennsylvania at 1200 Wilson Drive, West Chester, PA 19380.

## JURISDICTION AND VENUE

\
20. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a).

21. The potential damages in this matter are greater than $75,000.

22. The Plaintiff is an individual domiciled in the State of New Jersey.

23. Defendant QVC Group, Inc. f/k/a Qurate Retail Group, Inc. is a foreign corporation incorporated in the State of Delaware with its principal place of business located in the State of Colorado.

24. Defendant QVC is a foreign corporation with its principal place of business located in the State of Pennsylvania.

25. The requirements for jurisdiction under 28 U.S.C. § 1332(a) are satisfied because no plaintiff is domiciled in the same state as any Defendant.

26. This Court has supplemental jurisdiction over any related state law claims under 28 U.S.C. § 1367.

27. Venue is proper in the District of New Jersey as the Plaintiff is a resident of New Jersey and the alleged tortious actions were directed at a resident of the State of New Jersey.

## FACTS

28. Plaintiff has been on television since she was nine years old.

29. From then to the present, she has interviewed legendary athletes, internationally known personalities, and average citizens who needed their stories handled with compassion, empathy, and integrity.

30. She was a member of the 1988 United States Olympic Team and competed in the 400 Meter Hurdles.

31. During her career, Plaintiff is the only Olympian who has covered the Super Bowl, World Series, NBA All Star Games, Tour de France, championship boxing and tennis for Fox, CBS, Oxygen Media, NBC and ESPN.

32. In 2017, Plaintiff created the "Not Your Mamas 50" movement ("NYM50") that would speak to, and for, women who are over 50.

33. It was designed to be a movement that would see women over 50 and help them to be seen by the world at a time when they would otherwise be invisible.

### I. Initial Conversation With Sue Schick

34. In April of 2022, Plaintiff gave the opening keynote at the 2022 Women in Retail National Summit.

35. Following Plaintiff's address, Sue Schick (who was a Senior Vice President, Content and Broadcast Production at QVC) came and enthusiastically greeted her afterward.

36. Plaintiff was extremely flattered and had envisioned partnering with QVC on presenting Not Your Mamas as a lifestyle brand to the QVC woman.

37. Ms. Schick asked Plaintiff if she ever thought about hosting for QVC.

38. Plaintiff responded that she had been asked before but her vision was to position NYM50 to partner with QVC as a brand.

39. Ms. Schick kindly agreed to continue the conversation over email, which she did.

40. This led to Plaintiff having a day of executive level meetings and an official audition on July 27, 2022.

II. **Meeting with Lisa Morrisey and Rachel Ungaro**

41. When Plaintiff came to QVC, she found it refreshing that there were no waivers to sign that would keep her from speaking freely about the movement that she had created.

42. She first met with Lisa Morrissey and Rachel Ungaro.

43. Ms. Morrissey was the Senior Vice President, Merchandising and Ms. Ungaro was a Vice President, Commerce.

44. Plaintiff found it inspiring that she primarily spoke with women in key decision-making roles who had been in the QVC family for decades.

45. Women who asked thoughtful probing questions, took copious notes, who seemed to connect with the movement, its history, its operational elements, and most importantly, its spirit.

46. Ms. Ungaro and Ms. Morrisey spoke of their desire to lean into the adaptive space but shared no insight of how they would do this.

47. Plaintiff asked specific questions about how this would look.

48. Plaintiff asked if it would it be a person, a show, or something like a color that came on the screen when women clicked on adaptive products?

49. They had no idea—or at least they did not share any with Plaintiff.

### III. Meeting with Beverly Brettman

50. Plaintiff subsequently met with Beverly Brettman; a meeting that ended in an offer for a QVC Streaming show about NYM50.

51. Ms. Brettman was the Director of Video Commerce and Operations.

52. When Ms. Brettman found out that Plaintiff had spoken with Ms. Ungaro and Ms. Morrissey earlier that day, she said, "Well, if you are going to work on Big QVC you won't be able to work on Steaming."

53. PlaintiffI responded that, "It would make sense to start the conversation on QVC 1 & 2, and (possibly include products) then bring the women over to QVC Streaming to really dig into the women's story."

54. Ms. Brettman appeared to have an epiphany in that moment, as she said she had never thought about it the way Plaintiff had just positioned it.

55. She asked Plaintiff to create a proposal and sent the Plaintiff a sample template for her to use.

56. Plaintiff complied and sent the proposal less than a week later.

### IV. On-Camera Audition

57. Later that day, Plaintiff performed a series of in-depth auditions, sharing an item she had brought herself and one audition with a QVC host interviewing the Plaintiff about her item. A third audition involved an item was chosen for her by QVC.

58. Following the audition, she felt like her dreams and her vision for the NYM50 lifestyle brand movement, had at last, found its home.

### V. Meeting with Sue Schick

59. Plaintiff's day ended with an interview with Ms. Schick, where she extended a generous offer for Plaintiff to host on QVC 1 & 2.

60. Plaintiff respectfully declined the offer.

61. Instead, Plaintiff asked to assemble the individuals that she had already auditioned for and interviewed with for a brainstorming meeting.

62. It was clear to Plaintiff that the women with whom she had met and pitched the NYM50 show loved it.

63. After the audition, it was also evident that they could see Plaintiff's television acumen, experience, and natural ease in front of the camera.

64. Ms. Schick agreed but cautioned that we would have to meet again relatively soon before things got very busy, for the holiday season.

65. Plaintiff left Ms. Schick's office agreeing to send her an invite to join the private Facebook group, Not Your Mamas 50 community, which was sent on July 28, 2022.

66. The Plaintiff also sent a Facebook invite to Beverly Brettman, who joined the group.

### VI. The Aftermath

67. Plaintiff was told by Ms. Schick that she would work internally to swiftly coordinate a meeting with all of the executives Plaintiff had met that day, before things got busy at QVC.

68. Plaintiff was told she could not send thank you gifts, so she sent in-depth thank you emails to everyone who had taken time from their day to meet with her.

69. Over the next few days, Plaintiff created the NYM50 Streaming show one-page proposal Beverly requested.

70. After having sent the NYM50 Facebook invite, Plaintiff went several weeks without hearing from Ms. Schick.

71. Ms. Schick finally reached out on August ~~16th,~~ 2022, asking for an invite so she could join and invite several of her colleagues.

72. Plaintiff sent another invite that day.

73. That was the last Plaintiff heard from Ms. Schick, as she never accepted the invite to join the group.

74. On August 31st, 2022, Plaintiff received an email from Ms. Brettman offering her a five-episode mini-series on QVC Streaming for a NYM50 show.

75. She also shared that Ms. Schick thought Plaintiff made a great and lasting impression but that any kind of on-air possibilities will require a lengthier process.

76. Over the next 4.5 months, Plaintiff had sporadic contact with Ms. Brettman, who promised Plaintiff that she would receive a contract soon.

77. When Plaintiff finally received the contract, she was asked to redline the contract and add anything she wanted included.

78. Though finding this process odd, Plaintiff recapped what had been discussed and added things she felt were reasonable for a contract to include and asked that they take the notes and craft a contract that could be a starting point.

79. Shortly before the real iteration of the contract was to arrive, on January 13, 2023, Plaintiff asked for a zoom call with Ms. Brettman seeking a status update on her show.

80. During this meeting, Ms. Brettman brought the Plaintiff up to speed on changes at the company on January 10, 2023.

81. It was at that meeting that Plaintiff was informed that QVC would be rushing to air a show called, "Over 50 and Fab" (Fab50+) with Mally Roncal.

82. It would be a six-week show that NYM50 would debut after and run alongside.

83. Ms. Brettman assured the Plaintiff that the properties would be different and that Plaintiff would be proud of her streaming show.

84. Initially, Plaintiff decided to move forward with the process because Ms. Roncal is her own person and Plaintiff was her own person, each of them having their own unique assets to share with women over 50.

85. However, the more Plaintiff learned about Fab50+, the more it became clear that the NYM50 concept was the impetus for the swift creation and production of Fab50+.

86. In an E-mail dated January 26th, 2023, social media strategist Leo West, who was affiliated with QVC, noted in an E-mail that the two programs "seemed similar in nature," copying the visibility team from Fab50+. See **Exhibit A.**

87. On January 27, 2023, the Plaintiff listened to Ms. Roncal on Instagram Live, and Ms. Roncal discussed how the show was brought to her by QVC, how there would be a Facebook community and in-person parties, discussed the promo campaign that was being rolled out, and further highlighted other aspects of Fab 50+ that were alarmingly similar to Plaintiff's own pitch.

88. When Plaintiff asked QVC about promotion for her show she was told she might get a social media post or two, and that Plaintiff would appear on Ms. Roncal's show and Ms. Roncal on Plaintiff's show, but nothing more than that.

89. At that point, it was crystal clear that QVC used their promises of a show for women over 50, created and hosted by Plaintiff, to induce her to reveal her pitch to them without compensation or accreditation.

90. QVC then took Plaintiff's pitch, slapped a thin coat of paint on it, and called it Fab50+, while throwing table scraps at Plaintiff in order to attempt to placate her.

91. Suffice it to say, Plaintiff, disheartened at her treatment, did not move forward with QVC's sham program.

## COUNT I-FRAUDULENT INDUCEMENT
### (Against All Defendants)

92. Plaintiff repeats and re-alleges paragraphs 28-91 as if fully alleged herein.

93. Through its agents, Defendants made several misrepresentations of material fact in an effort to get Plaintiff to reveal the inherent details of NYM 50, as stated in Paragraphs 37, 52, 55, 59, 64, 67, 71, 75 and 83 referenced above.

94. These statements were false, as they explicitly indicated that Plaintiff was being considered for an on-air role as the face of her brand when, upon information and belief, Defendants had no intention of using her as such.

95. Rather, they were just interested in NYM 50 as an idea, even though that idea belonged to the Plaintiff.

96. At all times relevant herein, Defendants knew they had no intention to use Plaintiff as an on-air talent for any show directed to Women over 50.

97. Defendants intended to use these statement to induce Plaintiff's reliance.

98. Plaintiff reasonably relied on Defendant's statements and actions by sending QVC the detailed breakdown of NYM 50+ that Defendant requested and by continuing negotiations with QVC, revealing relevant details of her pitch,

99. As stated *supra*, Plaintiff suffered damages, refusing other opportunities, spending capital to trademark and streamline NYM 50+ as a brand ready to be spotlighted by QVC, and by failing to receive compensation and accreditation for what was, essentially, her creation.

### COUNT II- UNJUST ENRICHMENT
**(Against All Defendants)**

100. Plaintiff repeats and re-alleges paragraphs 28-91 as if fully alleged herein.

101. Defendant received a benefit from Plaintiff, namely the details behind Plaintiff's brand, NYM 50, during the July 27, 2022 interview process, the written pitch that was sent to Defendant at Defendant's request.

102. Defendant received the benefit at Plaintiff's expense, as she was not compensated for her work or her ideas.

103. It would be unfair for the Defendant to keep the benefits of Plaintiff's work without compensating her for the creation of the brand that Defendant appropriated to create the Fab50+ Ecosystem and business model.

104. The Plaintiff expected to be compensated for her work and ideas.

105. A reasonable person would expect to be compensated for Plaintiff's work and contributions to Fab 50+, the Fab50+ Facebook community and the traveling Fab50+ marketing campaign, including the Las Vegas Launch, through her creation of NYM 50.

\* \* \*

WHEREFORE, Plaintiff Leslie Maxie demands that judgment be entered against Defendants on Causes of Action One and Two. Plaintiff demands judgment in a sum to be determined at trial, and that Plaintiff be awarded their reasonable costs, fees, and disbursements to the extent available by law, and for such other and further relief as this Court deems fair and equitable.

Dated: April 22, 2025                          **PATRICK | DOERR PLLC**
       New York, New York

                                          s/ Joshua I. Gornitsky
                                          Joshua I. Gornitsky, Esq.
                                          1501 Broadway, Ste 2310
                                          New York, New York 10036
                                          212.680.4052
                                          joshua.gornitsky@patrickdoerr.com